## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

TERRY MIZELL,                                    Case No. 1:10-cv-53
      Petitioner,

                                         Beckwith, J.
      vs                                 Litkovitz, M.J.

WARDEN, MADISON CORRECTIONAL          **REPORT AND**
INSTITUTION,                          **RECOMMENDATION**
      Respondent.

Petitioner, a prisoner in state custody at the Madison Correctional Institution in London,

Ohio, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254,

challenging his convictions in 2007 on charges of child endangerment and felonious assault in

joined criminal cases before the Hamilton County, Ohio, Court of Common Pleas. This matter is

now before the Court on the petition and respondent's return of writ with exhibits. (Docs. 3, 7).

## I. PROCEDURAL HISTORY

### State Trial Proceedings

The incident giving rise to the criminal charges occurred in July 2006, when the infant

victim, whose name has been redacted from the record, suffered permanent developmental and

physical injuries while under petitioner's care. The Ohio Court of Appeals, First Appellate

District, has provided the following detailed summary of the background and trial proceedings

that resulted in petitioner's convictions and sentences:[1]

---

[1] 28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless petitioner rebuts the presumption by "clear and convincing evidence." Because petitioner has neither cited nor presented clear and convincing evidence to rebut the Ohio Court of Appeals' factual findings quoted herein, the state appellate court's factual findings are presumed to be correct. *See McAdoo v. Elo,* 365 F.3d 487, 493-94 (6th Cir. 2004).

## Baby Receives Severe Injuries

On July 20, 2006, DaJawana Martin left for work at 5:45 AM and left her children in the care of Mizell.  She had known Mizell for four months, and he had been living with her for two months.  At the time she left for work, her two-month-old son, [], was healthy.

At some point in the morning, [] suffered a significant brain injury.  Mizell claimed, in a subsequent statement to police, that the child had fallen from a bed (which was approximately 24 inches–at most–high) and had landed on the hard floor.  Mizell said that he had performed CPR on the child because the child was unresponsive.

Mizell sent a text message to Martin later in the day, telling her that [] had fallen from the bed.  The two sent messages back and forth for the next hour.  Mizell did not give details about the incident to Martin, including the fact that he had performed CPR on the infant.  The two eventually decided that Mizell should take [] to the emergency room.  At no point did Mizell call 911.

Martin had to take the bus from her worksite to meet Mizell at the hospital.  The bus ride took over an hour, and when she arrived, Mizell and [] were not there.  According to Martin, [] appeared lifeless when he arrived at the hospital.  While it is not entirely clear from the record, several hours seem to have passed between the time of the injury and []'s arrival at the emergency room.

Emergency-room personnel immediately began to administer CPR and other life-saving measures.  The infant was then taken into emergency surgery to relieve pressure from his brain.  Because of the significant delay, []'s injuries had become more serious.  While [] survived, he is developmentally delayed and has cerebral palsy and a reduced brain size.  His brain will remain undersized for the rest of his life.  He continues to receive treatment.

## The Road to Conviction

Mizell was charged with child endangerment, in violation of R.C. 2919.22(A), under case number B-0606897.  Mizell entered a plea of guilty on February 8, 2007.  After the trial court reviewed presentence information and determined that it would not sentence Mizell to community control, Mizell was allowed to withdraw the plea on April 9, and the case was set for trial on June 4.

On May [31], the Hamilton County Grand Jury returned a one-count indictment against Mizell for felonious assault, in violation of R.C. 2903.11(A)(1), under case number B-0704314.  The indictment alleged that Mizell had knowingly

2

caused serious physical harm to [].

On June 4, Mizell failed to appear for his trial and a capias was issued.  He was arrested ten days later.

The two cases were joined and were set for trial on August 13.  On that date, counsel asked for a continuance and a competency evaluation because Mizell was not assisting in his defense.  A hearing was held on September 18, Mizell was deemed competent, and the case was set for trial on October 9.

On the date set for trial, Mizell informed the trial court that he was not satisfied with his attorney and wanted new counsel.  The attorney he had was the second attorney that had been appointed for him, the first having withdrawn in November 2006.  The trial court denied his request.  Mizell continued to argue with the trial court, becoming increasingly uncooperative and repeatedly ignoring the trial court's instructions to calm down.  He then briefly struggled with one deputy until others were called to restrain him.

Because of his conduct, deputies requested that they be allowed to place Mizell in a stun belt.  A hearing was held immediately after Mizell was placed in the belt, during which the trial court gave its reasons for ordering the use of the belt.

At this point, Mizell asked to represent himself and sought a continuance so that he could review the medical records.  The trial court allowed Mizell to represent himself, with his appointed attorney as standby counsel, and told Mizell that he could have a few hours to review the records.  But the request for a continuance was denied.

Acting as his own counsel, Mizell repeatedly informed the prospective jurors that he was representing himself because the trial court would not give him a new lawyer.  The trial court informed him that these comments were improper.  In response, and in an attempt to show the jurors the conditions under which he was operating, he told them that "the Court has gotten irate and threatening [sic] with me with various things."  He showed them the stun belt and told them, "I have an electronic shock around my waist that if I say anything or do anything that the Court disagrees with, that officer there will push a button and 50,000 volts of electricity will come through me."  The trial court instructed the jury not to speculate on the reasons that the belt was being used, nor was it to consider its use as evidence against him.

After the state gave its opening statement, Mizell was asked to give his.  Instead, he repeatedly asked the trial court for a continuance so that he could prepare his case.  The trial court denied the request.  Mizell's opening statement consisted

3

mainly of the argument that everyone involved in the case knew that his crimes were not serious because he had been offered probation as part of the plea process. The trial court sustained the state's objections to this, and it was ordered stricken from the record.

The state called Martin to testify.  But Mizell kept talking and interrupting, which prevented the prosecutor from hearing Martin's responses to his questions.  Mizell was warned to be quiet.  When questioning resumed, Mizell continued to disrupt the proceedings.  When the trial court again admonished Mizell, he continued to respond that he needed "to get the evidence I requested."  When he was told that he would be removed if he did not stop, he continued.  After Mizell was removed, the prosecutor told the trial court that Mizell had told corrections officers in jail that "he was going to get his continuance today no matter what he had to do." Standby counsel was returned to his role as primary counsel, and the case proceeded.

Mizell was allowed to return to the trial on the second day of the proceedings. After the state rested, Mizell tried to call two witnesses who were going to testify that Mizell had been offered probation, but the trial court refused to allow the testimony.

The trial concluded, and the jury found Mizell guilty of both counts.  For the child-endangerment count, the trial court imposed the maximum sentence of five years "because you didn't take the child to the hospital.  Maybe if you had taken the child to the hospital sooner, he wouldn't have been as bad."  For the felonious-assault count, the trial court imposed the maximum sentence of eight years "because it's clear that you shook this baby, injured it initially."  The trial court ordered Mizell to serve the sentences consecutively.

(Doc. 7, Ex. 14, pp. 2-5; *see also* Exs. 1-8).  The final judgment entries were filed in the two cases on October 11, 2007.  (*See* Doc. 7, Ex. 12, attachments).

**State Direct Appeal Proceedings**

With the assistance of new counsel for appeal purposes, petitioner filed notices of appeal from the judgment entries to the Ohio Court of Appeals, First Appellate District, which *sua sponte* consolidated the appeals.  (Doc. 7, Exs. 9-11).  In the appellate brief filed by counsel, petitioner presented five assignments of error, including the following claims:

1.  The trial court erred as a matter of law by ordering appellant to wear an electric immobilization belt at trial which violated his constitutional rights to a fair trial, due process of law, the presumption of innocence and effective assistance of counsel.

2.  The trial court erred as a matter of law by denying appellant's motion to continue the trial date and by denying appellant's motion for new counsel which prejudiced his right to a fair trial and effective assistance of counsel.

3.  The trial court erred as a matter of law by infringing upon appellant's right to represent himself after that right had been granted by the trial court.

4.  The trial [court] erred as a matter of law by not dismissing the indictment under trial case number B0704314 on the basis of pre-indictment delay and a violation of appellant's speedy trial rights.

(Doc. 7, Ex. 12).

On September 26, 2008, the Ohio Court of Appeals issued an Opinion overruling petitioner's assignments of error and affirming the trial court's judgment.  (Doc. 7, Ex. 14).

Thereafter, petitioner filed a timely *pro se* appeal to the Ohio Supreme Court, raising the same claims of error that he had presented on direct appeal.  (Doc. 7, Ex. 15-16).  On February 18, 2009, the Ohio Supreme Court declined jurisdiction to hear the case and summarily dismissed the appeal "as not involving any substantial constitutional question."  (Doc. 7, Ex. 18).

**State Post-Conviction Proceedings**

Apparently, while his appeal was pending before the Ohio Court of Appeals, petitioner filed a *pro se* petition to vacate or set aside the judgments of conviction or sentence, which was overruled by the trial court without opinion.  (Doc. 7, Brief, p. 8 & Ex. 19).[2]

The Ohio Court of Appeals, First Appellate District, granted petitioner leave to file a

_____

[2]Respondent states that although efforts were made to obtain a copy of the post-conviction motion for submission to the Court, neither the Hamilton County prosecutor's office nor the Hamilton County Clerk of Court were able to locate it.  (Doc. 7, Brief, p. 8 n.1).

delayed appeal from the trial court's ruling.  (Doc. 7, Ex. 22).  However, on November 14, 2008,

the state appellate court *sua sponte* dismissed the appeal "for failure of the appellant to comply

with the Ohio Rules of Appellate Procedure to wit:  the appellant's brief was not timely filed."

(Doc. 7, Ex. 23).  Respondent states that petitioner did not pursue an appeal from that decision to

the Ohio Supreme Court.  (Doc. 7, Brief, p. 8).

### Federal Habeas Corpus

Petitioner filed the instant federal habeas corpus petition in January 2010.  (Doc. 3).  He

alleges four grounds for relief:

**Ground One:**  Being ordered to wear an electric immobilization belt at trial.

**Supporting Facts:**  On the first day of trial, I was ordered to wear an electronic immobilization belt for being disruptive.  I was still required to wear the belt, even though my behavior did not warrant it.

**Ground Two:**  My motion for a continuance and my motion for new counsel were denied.

**Supporting Facts:**  During trial I asked the trial judge for a continuance to review the box of evidence I received since I was representing myself and was denied.  I expressed to the judge my displeasure and lack of trust in my appointed counsel and asked for new counsel which I was denied.

**Ground Three:**  My right to represent myself was infringed after that right had been granted by the trial court.

**Supporting Facts:**  I asked the judge could I represent myself which he agreed to. During trial I was removed from the court room which prohibited me from representing myself.  Plus the trial proceeded without my presence which the trial lawyer who I asked to be removed from my case being able to take over my trial in my place. [sic]

**Ground Four:**  My indictment under case #B0704314 should've been dismissed on the basis of pre-indictment delay, and my fast and speedy trial rights were violated.

      **Supporting Facts:**  I was indicted on case #B0704314 on May 30, 2007, which was almost 10 months after I was indicted on case #B0606897.  I was only indicted on case #B0704314 after I withdrew my plea of guilty on case #B0606897, which I withdrew because the judge decided that he wasn't go[ing] to place me on community control in exchange for me pleading guilty to case #B0606897.

(Doc. 3, pp. 6, 8, 9, 11).

## II.  OPINION

### A.  Petitioner Is Not Entitled To Relief Based On The Claim Alleged In Ground One Challenging The Trial Court's Order Requiring Him To Wear A Stun Belt During Trial

      In Ground One of the petition, petitioner claims that he was denied a fair trial because the trial court required him to wear an electronic immobilization device, or "stun belt," during the criminal trial although his "behavior did not warrant" the restraint.  (Doc. 3, p. 6).  In the return of writ filed in response to the petition, respondent contends that petitioner has waived this claim for relief because he failed to lodge an objection at trial to the trial court's order.  (Doc. 7, Brief, pp. 13-15).  Alternatively, respondent argues that the claim lacks merit.  (Doc. 7, Brief, pp. 16-20).

      The record reflects that on the first day of trial, before the prospective jurors were brought in for voir dire questioning, petitioner became belligerent and disruptive when the trial court refused his request for appointment of a new lawyer to represent him at trial.  (Doc. 7, Ex. 29, Tr. 45-51).  As petitioner grew more and more agitated, refusing to comply with the court's decision, the trial court ordered petitioner to "quit moving around," and stated further:  "You're giving the deputy a hard time.  I'll find you in contempt and give you more time."  (Doc. 7, Ex. 29, Tr. 49).  Although he was warned, petitioner continued to defy the court's admonitions, and began to pull away from the deputy who, by that point, was trying to restrain him.  (Doc. 7, Ex. 29, Tr. 50-51,

54).  Apparently, two more deputies were called in to assist in restraining petitioner.  (Doc. 7, Ex. 29, Tr. 51, 54).

At that juncture, the deputy requested that petitioner, who was still arguing "I don't have to have him as my lawyer," be placed in an "electronic stun belt."  (Doc. 7, Ex. 29, Tr. 51-52).  In response, petitioner stated:  "I ain't being disorderly.  I don't have to have him as my lawyer."  (Doc. 7, Ex. 29, Tr. 52).   The trial court agreed with the deputy that the stun belt was necessary to keep petitioner from "get[ting] out of hand," and ordered that petitioner be placed in the restraint.  (Doc. 7, Ex. 29, Tr. 52).

A recess was taken at that point.  When the court reconvened, the following discussion was held on the record before the prospective jurors were brought into the courtroom to commence the trial proceedings:

> THE COURT:  I have Mr. Mizell.  You have the belt on.  We're deciding whether to put the belt on, actually you have the belt on him.  I actually told you to do that before we bring the jury in, though we should go over it and have a little hearing.
>
> Before we took a break for lunch and the meeting I had to go to, we had a problem with Mr. Mizell.  I think the record should reflect that he was pulling away from the Sheriff's deputy, and kind of spinning . . . away from him.  So he called for help and a couple other deputies came and he was being very uncooperative and basically telling me what he felt, how I should run my courtroom and things like that.
>
> So, as a result, we had the belt put on him, which is a shocking device.  Now, that's covered up, the jury won't see it, right?
>
> THE CAPTAIN:  That's correct, Your Honor.
>
> THE COURT:  So, there's no reason to tell the jury, let them know about it really.  Has he calmed down since you put it on him?
>
> THE DEPUTY: Yes.
>
> THE COURT:  He has.  All right.  Do you think I should add anything?

8

[PROSECUTOR]:  Other than I think they read the explanation to him of what it is.

THE COURT:  Did you explain to him what happens?

THE CAPTAIN:  Correct, he signed it.

THE COURT:  He signed it.  We will make that part of the record.  I'll sign it, too.  So he understands what happens one time if he gets out of line.  Just make that part of the record in this case. . . .

****

. . . .Let the record reflect that he's in civilian clothes and you're taking both cuffs off?

THE CAPTAIN:  Yes, sir.

THE COURT:  So the cuffs won't be seen by the jury, and the belt is underneath him so they won't see the belt either.  The jury won't see the belt either.  He looks like a person that just walked into our courtroom.

All right.  Have a seat, behave yourself.  Talk to your lawyer.

(Doc. 7, Ex. 29, Tr. 54-56, 58-59).

Later, during the voir dire proceeding, after petitioner was granted permission to represent himself, petitioner stated in the jurors' presence:  "They don't want me to show you this, but I have an electronic shock around my waist that if I say anything or do anything that the court disagrees with, that officer there will push the button and 50,000 volts of electricity will come inside of me." (Doc. 7, Ex. 29, Tr. 149).  The court immediately intervened, instructing the jury in pertinent part as follows:

Okay.  It's difficult when a defendant wants to represent himself.  He went into things that really I wasn't going to bring up, because I didn't want to tell you he has a shock device on him.  But there's some reasons for that and you can't hold that against him, that doesn't have any issue as to whether or not he's guilty or innocent.  But for his benefit, I wasn't going to bring that up because I didn't think jurors should know that and we tried to hide that by putting clothes over it.

9

> He did bring it up. Since he brought it up, I was going to tell you that the issue – that the fact that he has an electronic shock device on him should not be held against him. It's not an issue as to whether he's guilty or innocent. The State still has to prove guilt beyond a reasonable doubt.

(Doc. 7, Ex. 29, Tr. 149-50).

On appeal to both the Ohio Court of Appeals and the Ohio Supreme Court, petitioner claimed that the trial court improperly ordered the use of the stun belt during the trial without holding a hearing "regarding the need for [petitioner] to wear the 'stun belt,'" which deprived petitioner of his constitutional rights to a fair trial and the effective assistance of counsel. (Doc. 7, Ex. 12, p. 7; Ex. 16, p.7). The Ohio Court of Appeals, which was the only state court to issue a reasoned decision addressing the claim, overruled the assignment of error, reasoning in relevant part as follows:

> As this court has noted, "[a] stun belt may be used only under 'unusual circumstances' and only as a 'last resort.' A court may order a stun belt only when the record shows that the restraints are justified 'by an essential state interest specific to each trial,' and when, upon consideration of 'the [defendant's] actions both inside and outside the courtroom, as well as his demeanor while court is in session,' the court finds that the stun belt is necessary to advance the state interest."

> In this case, Mizell's conduct prior to the trial court's decision to order the use of the stun belt amply justified the decision to do so. He had demonstrated that he would not listen to the instructions of the court, and that he was not above becoming physical to show his displeasure with the proceedings. The evidence supported the conclusion that the use of the stun belt was necessary to advance an essential state interest–an orderly proceeding.

> Even if the record did not so support the conclusion, we would find no reversible error. The Ohio Supreme Court has held that a defendant waives any error relating to a stun belt by failing to object. Since Mizell failed to object at trial, he would have to show prejudicial plain error to prevail on appeal.

> The record does not indicate that Mizell was made uncomfortable by the belt or that it impeded his ability to represent himself or to assist counsel. Therefore, the only way that Mizell could show prejudice would be if the jury was made aware of it.

10

> While the jury did know that he was wearing the belt, the jurors only knew because Mizell himself showed it to them during voir dire.  Thus, any error in this regard would have been invited.

(Doc. 7, Ex. 14, p. 6) (footnote citations to Ohio cases omitted).

As an initial matter, as respondent has argued in the return of writ, the Ohio Court of Appeals ruled that petitioner waived any error relating to the use of the stun belt by failing to lodge an objection at trial.  However, the record reveals that petitioner did assert that he was not being "disorderly" when the deputy first requested permission from the court to have petitioner placed in the restraint.  (*See* Doc. 7, Ex. 29, Tr. 52).  Because it can be argued that petitioner's statement amounted to an objection to the deputy's request, the undersigned will assume, without deciding, that the claim alleged in Ground One is not waived and is subject to review on the merits.

In this federal habeas case, the applicable standard of review for addressing the merits of petitioner's due process claim is set forth in 28 U.S.C. § 2254(d).  Under that provision, a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits by the state courts unless the adjudication either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).  The provision applies even in cases where the state courts summarily reject a claim or issue a ruling "unaccompanied by an opinion explaining the reasons relief has been denied."  *Harrington v. Richter,* 131 S.Ct. 770, 784-85 (2011).

A legal principle is "clearly established" for purposes of habeas corpus review "only when

11

it is embodied in a holding of [the Supreme] Court." *Thaler v. Haynes,* __ U.S. __, 130 S.Ct. 1171, 1173 (2010).  "[A] federal habeas court reviewing the state-court judgment must apply the law that controlled 'at the time his state-court conviction became final.'"  *Miller v. Stovall,* 608 F.3d 913, 919 (6th Cir. 2010) (quoting *Williams v. Taylor,* 529 U.S. 362, 390 (2000)), *petition for cert. filed,* 79 U.S.L.W. 3404 (U.S. Dec. 21, 2010) (No. 10-851).

In addition, the "contrary to" and "unreasonable application" clauses set forth in 28 U.S.C. § 2254(d)(1) have independent meanings:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts. . . .  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of a particular case. . . .  The focus on the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694 (2002) (citation omitted).

Although the standard is difficult to meet, § 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents."  *Harrington,* 131 S.Ct. at 786.  In other words, to obtain federal habeas relief under that provision, the state prisoner must show that the state court ruling on the claim presented "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* at 786-87.  Moreover, under the "unreasonable application clause"

inquiry, the writ may issue only if the application is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000) (citing *Williams,* 529 U.S. at 412).

As the Sixth Circuit noted in *Earhart v. Konteh,* 589 F.3d 337, 347-48 (6th Cir. 2009), *cert. denied,* 131 S.Ct. 178 (2010), "the Supreme Court has yet to consider the issue of whether and when a trial court, consistent with constitutional protections, may order a defendant to wear a stun belt during his trial."  However, as the *Earhart* court also pointed out, the Supreme Court has made it clear in a series of cases decided over the past forty-plus years that subjecting a criminal defendant to physical restraints during his criminal trial implicates his right to a fair and impartial trial.  *Id.* at 348 (citing *Holbrook v. Flynn,* 475 U.S. 560, 568-69 (1986); *Illinois v. Allen,* 397 U.S. 337, 343-44 (1970)); *cf. Estelle v. Williams,* 425 U.S. 501, 505 (1976) (holding that defendants may not be presented to the jury in prison-issue clothing where to do so "furthers no essential state policy," because "an unacceptable risk is presented of impermissible factors coming into play").

In *Holbrook,* 475 U.S. at 568-69, the Supreme Court suggested that shackling is an "inherently prejudicial practice," which "should be permitted only where justified by an essential state interest specific to each trial."[3]  In addition, in *Allen,* 397 U.S. at 344, the Court stated that "no defendant should be tried while shackled and gagged except as a last resort."

The *Allen* Court explained that the sight of physical restraints can have a significant prejudicial effect on the jury.  *Id.*  Indeed, as the Sixth Circuit has pointed out:

---

[3]*See also Kennedy v. Cardwell*, 487 F.2d 101 (6th Cir. 1973) (recognizing inherent prejudice to a defendant required to be manacled or shackled while in the courtroom during his trial).

> There can be little question that the holdings of the Supreme Court reflect a strong concern that trial practices such as shackling can have substantial or injurious influences on jury verdicts.  The holdings in *Estelle* and *Holbrook*, especially, effectively state that indicia of guilt, such as shackles, impose a significant level of harm upon the presumption of innocence, and that the injurious influence of such harm can only be overcome by a confident finding that the indicia were warranted or that the outcome of the defendant's case was not affected.

*Ruimveld v. Birkett*, 404 F.3d 1006, 1014 (6th Cir. 2005) (citing *Estelle*, 425 U.S. at 512-13;

*Holbrook*, 475 U.S. at 568-69).

Nevertheless, in holding that the trial court did not abuse its discretion in ordering the

removal of the defendant from the courtroom because of his disruptive behavior, which was "of

such an extreme and aggravated nature as to justify either his removal . . . or his total physical

restraint," the *Allen* Court acknowledged that "binding and gagging might possibly be the fairest

and most reasonable way" to handle such a defendant.  *Allen,* 397 U.S. at 344, 346-47.  The Court

explained:

> It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country.  The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated.  We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case.  No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations.  We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant like Allen:  (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly.

*Id.* at 343-44.

More recently, in *Deck v. Missouri,* 544 U.S. 622 (2005), the Supreme Court held that "the

Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a

trial court determination, in the exercise of its discretion, that they are justified by a state interest

14

specific to a particular trial." *Deck,* 544 U.S. at 629. In so holding, the Court noted that "[t]he law has long forbidden routine use of visible shackles" during trial and that "it permits a State to shackle a defendant only in the presence of a special need." *Id.* at 626.[4] After discussing the origins of the rule recognized in the commentaries of Blackstone, in treatises and prior court decisions, including its decisions in *Holbrook* and *Allen, see id.* at 626-28, the Court concluded:

> Courts and commentators share close to a consensus that, during the guilt phase of the trial, a criminal defendant has a right to remain free of physical restraints that are visible to the jury; that the right has a constitutional dimension; but that the right may be overcome in a particular instance by essential state interests such as physical security, escape prevention, or courtroom decorum. . . .
>
> Lower courts have disagreed about the specific procedural steps a trial court must take prior to shackling, about the amount and type of evidence needed to justify restraints, and about what forms of prejudice might warrant a new trial, but they have not questioned the basic principle. They have emphasized the importance of preserving trial court discretion (reversing only in cases of clear abuse), but they have applied the limits on that discretion described in *Holbrook*, *Allen*, and the early English cases. In light of this precedent, and of a lower court consensus disapproving routine shackling dating back to the 19th century, it is clear that this court's prior statements gave voice to a principle deeply embedded in the law. We now conclude that those statements identify a basic element of the "due process of law" protected by the Federal Constitution.

*Id.* at 628-29.[5]

Since *Deck* was decided, the Supreme Court has not extended the constitutional protection against unnecessary physical restraints during trial beyond the use of visible restraints. *See*

_____

[4] *See also Lakin v. Stine,* 431 F.3d 959, 963 (6th Cir. 2005) ("[T]he principle that shackling a defendant at trial without the individualized determination as to necessity violates the due process clause was clearly established long before *Deck* was decided.")

[5] It is noted that in *Deck*, the Supreme Court specifically considered whether shackling a convicted offender during the penalty phase of a capital trial triggers constitutional concerns. *Deck*, 544 U.S. at 624. The Court ruled that "the Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, *unless* that use is 'justified by an essential state interest'–such as the interest in courtroom security–specific to the defendant on trial." *Id.* (citing *Holbrook,* 475 U.S. at 568-69; *Allen,* 397 U.S. at 343-44) (emphasis in original).

*Earhart,* 589 F.3d at 348-49; *Mendoza v. Berghuis,* 544 F.3d 650, 654 (6th Cir. 2008), *cert. denied,* 129 S.Ct. 1996 (2009). In *Mendoza,* the Sixth Circuit expressly rejected the petitioner's argument that *Deck* applied to require the granting of habeas relief on a claim challenging his placement in leg shackles that were not visible to the jury during the trial proceedings. In so ruling, the court pointed out that the Supreme Court "was careful to repeat" throughout its opinion in *Deck* that the facts and holding concerned "only *visible* restraints at trial." *Mendoza,* 544 F.3d at 654 (emphasis in original). While recognizing that "a state court may apply a precedent unreasonably by refusing to extend it to facts to which it obviously ought to apply," the Sixth Circuit concluded:

> [T]he particular limitation that [the petitioner] seeks to overleap is one that the Supreme Court emphasized at least six times in *Deck*. And a limitation thus emphasized is one the state courts may honor, with relatively little fear of being found "objectively unreasonable" for doing so.

*Id.* at 655; *cf. Earhart*, 589 F.3d at 347-49 & n.6 (relying on *Mendoza* in holding that under the "limited purview" of federal habeas review, the petitioner's claim challenging the state trial court's ruling requiring him to wear a stun belt at trial without an individualized finding of necessity "rises and falls on the question whether the stun belt was visible to the jury").

Upon review of the record in the instant case, the undersigned concludes that the Ohio courts' adjudication of petitioner's claim challenging the use of a stun belt during his trial is neither contrary to nor involves an unreasonable application of the governing Supreme Court precedents. In accordance with the clearly-established standards enunciated by the Supreme Court in *Allen, Holbrook* and *Deck*, the Ohio Court of Appeals recognized that a stun belt is a physical restraint, which may be used only "as a last resort" when necessary to advance an essential state interest, such as an "orderly proceeding," specific to the trial. The state appellate court also

16

reasonably determined that the trial court was justified in ordering the use of the stun belt as a means of preserving the dignity and decorum of the courtroom given the particular circumstances of this case. Although petitioner asserted that he was not being disorderly when the deputy requested that a stun belt be used to restrain him, the record reflects that, as in *Allen*, petitioner's behavior in response to the trial court's denial of his request for a new lawyer was "disruptive, contumacious, [and] stubbornly defiant." *See Allen,* 397 U.S. at 343-44.

In accordance with *Deck,* before the prospective jurors were brought into the courtroom for voir dire, the trial court made an individualized determination regarding the necessity of the restraint, provided an explanation on the record as to why the decision was made to use the stun belt, and ensured that the restraint was "covered up" so that it could not be seen by the jury. (Doc. 7, Ex. 29, Tr. 54-56, 58-59). As the Ohio appellate court reasonably found, there is no evidence in the record to suggest that the restraint impeded petitioner in his ability to represent himself or assist his counsel. Moreover, because the jurors were made aware of the stun belt only because petitioner showed it to them, petitioner has waived any constitutional challenge stemming from the fact that the jurors saw him in the restraint, which otherwise would have remained concealed from their view. *Cf. Vendeville v. Birkett,* No. 4:06cv89, 2009 WL 3233900, at *1, *8 (W.D. Mich. Sept. 30, 2009) ("By rejecting the opportunity to stand trial in civilian clothing and by rejecting the court's attempt to hide his restraints from the jury, petitioner waived any constitutional challenges to his conviction on the basis that the jury saw him dressed and shackled as a prisoner.").

In any event, even assuming that error occurred in this case, the use of the stun belt during petitioner's trial is subject to review for harmless error. *See, e.g., Deck,* 544 U.S. at 635; *Lakin v. Stine,* 431 F.3d 959, 966 (6th Cir. 2005); *Ruimveld,* 404 F.3d at 1015; *Robinson v. Gundy,* 174 F.

17

App'x 886, 893 (6th Cir. 2006).  Here, when petitioner showed the restraint to the jurors during voir dire, the trial court immediately intervened and instructed them that the fact that petitioner had "an electronic device on . . . [c]ould not be held against him" and was not a relevant issue that could be considered in determining his guilt or innocence on the criminal charges.  (Doc. 7, Ex. 29, Tr. 150).  In addition, overwhelming evidence was presented to establish petitioner's guilt for child endangerment and felonious assault.  One of the doctors who treated the victim in the hospital emergency room testified that the victim's type of brain injury and retinal hemorrhaging were not consistent with injuries incurred as a result of a fall from a bed as petitioner had claimed, and that the "only mechanism" for causing such injuries "is a violent shaking type of episode that happens to these babies."  (Doc. 7, Ex. 31, Tr. 334-36, 344-45).  Furthermore, as reflected in the Ohio Court of Appeals' factual findings regarding the incident giving rise to the charges (*see* Doc. 7, Ex. 14, pp. 2-3), it is clear from the record that petitioner endangered the victim's life and contributed significantly to his injuries by waiting several hours before seeking medical assistance after the initial injury occurred.  (*See also* Doc. 7, Ex. 30, Tr. 243-301; Ex. 31, Tr. 304-59).  In light of the court's curative instruction and the overwhelming evidence of guilt, any error by the trial court in permitting the use of a stun belt at trial was harmless.  *Cf. Lakin,* 431 F.3d at 966; *Robinson,* 174 F. App'x at 893.

Accordingly, in sum, petitioner has not demonstrated that he is entitled to relief based on the merits of the constitutional claim alleged in Ground One of the petition.

**B.  Petitioner Is Not Entitled To Relief On His Claim In Ground Two Challenging The Trial Court's Denial Of His Motions During The Trial For A Continuance And New Counsel**

In Ground Two of the petition, petitioner essentially alleges that he was deprived of his

constitutional right to a fair trial when the trial court denied his requests asserted for the first time at trial for a continuance and new counsel.  (Doc. 3, p. 8).

It appears from the record that on the first day of trial, before the prospective jurors were brought into the courtroom for voir dire, petitioner asked for a "new lawyer" and also expressed that he wanted to represent himself "along with a new lawyer."  (Doc. 7, Ex. 29, Tr. 44-45).  The only reason he gave for wanting new counsel was that he did not "trust" his attorney, who was "incompetent" and had "told nothing but lies to [him]."  (Doc. 7, Ex. 29, Tr. 45-46).  When specifically asked by the court "what lies" had been told to him by his counsel, petitioner refused to answer the question and merely reiterated over and over again that he wanted a new lawyer, that he had a "right" to a new lawyer, and that the court could "not sit up there and make me have him as my lawyer if I don't trust him."  (Doc. 7, Ex. 29, Tr. 46-50).

The court refused petitioner's repeated demands for a new lawyer.  The court emphasized that petitioner's current counsel was a "good lawyer" who had "won a lot of cases in here;" that petitioner was already on his second attorney, after firing the first lawyer appointed to represent him in the case; and that although the matter had been pending for months, with the case set for trial and continued on prior occasions, petitioner had waited until the first day of the final scheduled trial date to demand new counsel.  (Doc. 7, Ex. 29, Tr. 45, 47, 56-58).

After the trial court ordered petitioner's placement in a stun belt because of his disruptive and defiant behavior in response to its ruling, the prospective jurors were brought into the courtroom for voir dire.  (*See* Doc. 7, Ex. 29, Tr. 50-59).  During the voir dire proceeding, petitioner requested and was granted permission to represent himself, but with the assistance of his counsel in an advisory role.  (Doc. 7, Ex. 29, Tr. 80-82).  Petitioner also requested and was granted

access to the victim's medical records, which had been provided to the defense by the State during pretrial discovery. (Doc. 7, Ex. 29, Tr. 89-91). At the close of the first day of the trial, after the jury left the courtroom, it was agreed that petitioner would be given access to the medical records for a few hours the next morning before the trial proceeding recommenced. (Doc. 7, Ex. 29, Tr. 188-92).

The record reflects that the victim's medical records were provided to petitioner the next morning as agreed and that petitioner was able to review and go over them with counsel in an advisory role for a few hours before the trial began after noon. (Doc. 7, Ex. 30, Tr. 194-200). Before the jury was brought into the courtroom, however, petitioner demanded that he be given more time to review the evidence. (Doc. 7, Ex. 30, Tr. 197-98). At that point, the prosecutor stated for the record that the victim's medical records were made available to the defense over a year earlier, in September 2006, and further argued: "When he shows up on the day of trial and says I want to look at this, it's a ruse to get his case continued." (Doc. 7, Ex. 30, Tr. 199). Petitioner's counsel stated that he had provided a summary of the information contained in the records to petitioner that morning and that in the months prior to the trial, he had attempted to explain to petitioner "what the records said," but that petitioner would "look[] away" and "would not cooperate in any way, shape, or form." (Doc. 7, Ex. 30, Tr. 197-98, 200).

Petitioner was not granted additional time to review the victim's medical records, and the trial reconvened for opening statements. (Doc. 7, Ex. 30, Tr. 202-03). After the prosecutor gave his opening statement, petitioner again requested a continuance so that he could review evidence, which was denied. (Doc. 7, Ex. 30, Tr. 224-25). During the first witness's direct examination, petitioner became increasingly disruptive and eventually began to repeatedly demand that he be

20

given the evidence that he had requested.  (Doc. 7, Ex. 30, Tr. 236-37).  The court warned petitioner three times that he would be removed from the courtroom if he could not "be quiet." (Doc. 7, Ex. 30, Tr. 236-37).  Petitioner refused to comply with the court's warnings and admonitions and continued to demand "all the evidence that I want."  (Doc. 7, Ex. 30, Tr. 236-37). At that point, the court ordered petitioner's removal from the courtroom for the remainder of the day.  (Doc. 7, Ex. 30, Tr. 237).

In a side-bar conference held after petitioner's removal from the courtroom, the prosecutor stated for the record that petitioner had made comments to correction's officers at the jail that "he was going to get his continuance today no matter what he had to do."  (Doc. 7, Ex. 30, Tr. 238). The side-bar colloquy continued in pertinent part as follows:

> [PROSECUTOR]:  I would say this is his second attorney that the court has appointed for him.  It's about the fifth or sixth time it's been set for trial, you know, he's managed to keep continuing it in the past.  One time by capiasing and not showing up when the case was set for trial, and another time when he absolutely refused to cooperate with [his counsel] who had at that point requested a competency examination to determine if he was even competent.
>
> THE COURT:  And he refused to look at any of the records.
>
> [DEFENSE COUNSEL]:  That's correct. . . .
>
> ****
>
> THE COURT:  And the Sheriffs told me today he was going to try to disrupt the courtroom.  Of course, he's made loud statements and talked out of turn and . . . tried to speak over the witness so the jury couldn't hear the witness'[s] testimony.
>
> ****
>
> [PROSECUTOR]:  . . .[H]e just wants a continuance.
>
> THE COURT:  Actually, he just wants to cause disruption. . . .  He thinks I can't remove him, but at this point I had to remove him for the safety of the jurors, too,

> because . . . I was informed by the Sheriff's Department today he was going to
> create a scene and try to disrupt the entire proceedings. . . .

(Doc. 7, Ex. 30, Tr. 239-41). After petitioner's attorney agreed to serve as petitioner's

representative in petitioner's absence from the courtroom, the prosecutor further posited for the

record:

> Ever since [petitioner's counsel] has been appointed, I have communicated with
> him throughout the case. . . . Anytime he's needed anything or needed to see
> anything, he's called me. We discussed the case. I have no reason to believe
> [petitioner's counsel] was not prepared to try this case when it started, Judge. I'm
> sure he was ready to try the case. And this is not a situation where . . . counsel is
> incompetent because they weren't prepared. Certainly, [petitioner's counsel] was
> prepared to try the case. It's just this defendant did not want this trial to go forward.

(Doc. 7, Ex. 30, Tr. 242).

On direct appeal to both the Ohio Court of Appeals and Ohio Supreme Court, petitioner

claimed that the trial court's refusal to grant his requests for a new lawyer and for a continuance

deprived him of a fair trial. (*See* Doc. 7, Exs. 12, 16). The Ohio Court of Appeals was the only

court to issue a reasoned decision on appeal affirming the trial court's challenged rulings. In

overruling petitioner's assignment of error, the court made findings of fact, which are presumed

correct, *see supra* p. 1. n.1, and reasoned as follows:

> The right to counsel does not include a right to a peaceful and meaningful
> relationship between counsel and the defendant. "[T]o discharge a court-appointed
> attorney, the defendant must show a breakdown in the attorney-client relationship of
> such magnitude as to jeopardize the defendant's right to effective assistance of
> counsel. The term of art 'actual conflict' refers not to a personality conflict but to a
> conflict of interest. The Sixth Amendment does not guarantee 'rapport' or a
> 'meaningful relationship' between client and counsel." Thus, "[h]ostility, tension,
> or personal conflict between an attorney and a client that do not interfere with the
> preparation of a competent defense are insufficient to justify the withdrawal of
> appointed counsel." Under the relevant analysis, the right to counsel must be
> balanced against the court's authority to control its docket, as well as its awareness
> that a "demand for counsel may be utilized as a way to delay the proceedings or

22

trifle with the court."

In evaluating a motion for a continuance, the trial court should consider (1) the length of the requested delay; (2) whether other continuances have been granted; (3) the inconvenience to the litigants, witnesses, opposing counsel, and the court; (4) whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; (5) whether the defendant has contributed to the circumstance that gives rise to the request for a continuance; and (6) other relevant factors of each case.

This case had been pending in the trial court for many months, and it was not until the day of trial that Mizell claimed that he needed a new attorney.  Throughout the proceedings, Mizell's conduct was disrespectful and disruptive.  The trial date had been continued several times, once because Mizell failed to appear and once because his refusal to cooperate with counsel rose to the level of bringing his competence into question.  His behavior made it clear that he would have done whatever it took to derail the proceedings.  The trial court did not abuse its discretion when it reached this conclusion.  Therefore, the decision not to continue the case or to appoint new counsel was not an abuse of discretion.

(Doc. 7, Ex. 14, pp. 7-8) (footnote citations omitted).

This Court's review of the state trial and appellate court decisions is limited.  The federal habeas court has jurisdiction to review a state prisoner's habeas petition only on the ground that the challenged confinement violates the Constitution, laws or treaties of the United States.  *See* 28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions").  Therefore, petitioner is not entitled to habeas relief to the extent he alleges that the trial court abused its discretion and thus erred under state law in denying his requests for a continuance and new counsel.  *Cf. Sheppard v. Warden, Lebanon Corr. Inst.,* No. 1:08cv298, 2010 WL 1213500, at *5 (S.D. Ohio Mar. 25, 2010) (Spiegel, J.) (citing *Foley v. Parker*, 488 F.3d 377, 389 (6th Cir. 2007)).  Petitioner is entitled to relief only upon a showing that the trial court's rulings deprived him of a right guaranteed by the federal Constitution.  Upon

23

separate consideration of the two rulings challenged herein, the undersigned concludes in accordance with 28 U.S.C. § 2254(d), *see supra* pp. 11-13, that the state appellate court's decision overruling petitioner's assignment of error is neither contrary to nor involves an unreasonable application of the clearly-established Supreme Court precedents applicable to the issues presented, and is based on a reasonable determination of the facts as reflected in the record.

1. <u>Denial of Motion for Continuance.</u>

The Constitution guarantees to criminal defendants a "meaningful opportunity to present a complete defense." *California v. Trombetta,* 467 U.S. 479, 485 (1984); *see also Mackey v. Dutton,* 217 F.3d 399, 407 (6th Cir. 2000) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.") (quoting *Chambers v. Mississippi,* 410 U.S. 284, 294 (1973)).

The right to present a defense, however, may be reasonably restricted "to accommodate other legitimate interests in the criminal trial process," *United States v. Scheffer,* 523 U.S. 303, 308 (1998), and "[n]ot every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel," *Morris v. Slappy*, 461 U.S. 1, 11 (1983). In *Morris,* the Supreme Court stated:

> Trial judges require a great deal of latitude in scheduling trials. Not the least of their problems is assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel.

*Morris,* 461 U.S. at 11-12 (quoting *Ungar v. Sarafite,* 376 U.S. 575, 589 (1964)); *see also Foley,* 488 F.3d at 389 ("Denial of a continuance rises to the level of a constitutional violation only if it is

so arbitrary as to violate due process.").

"There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process." *Ungar,* 376 U.S. at 589. Rather, the "answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Id.*

The Sixth Circuit has considered the following factors in determining whether a criminal defendant was denied due process by the denial of a motion for continuance: "the diligence of the defense in interviewing witnesses and procuring their presence, the probability of procuring their testimony within a reasonable time, the specificity with which the defense is able to describe their expected knowledge or testimony, the degree to which such testimony is expected to be favorable to the accused, and the unique or cumulative nature of the testimony." *Mackey,* 217 F.3d at 408 (quoting *Hicks v. Wainwright,* 633 F.2d 1146, 1149 (5th Cir. 1981)). Courts (including the Sixth Circuit) have cited additional factors to be considered, such as the length of the requested delay; whether other continuances were requested and granted; the balanced convenience or inconvenience to the litigants, witnesses, counsel, and the court; whether the requested delay was for legitimate reasons; whether the defendant contributed to the circumstance which gave rise to the request for a continuance; the complexity of the case; and whether the denial of a continuance resulted in identifiable prejudice to the defendant's case. *See, e.g., Wilson v. Mintzes,* 761 F.2d 275, 281 (6th Cir. 1985) (and cases cited therein).

Because "[n]o absolute rule can be articulated as to the minimum amount of time required for an adequate preparation for trial of a criminal case," in order to obtain relief, the defendant must demonstrate that the denial of a continuance resulted in prejudice or, conversely, that a continuance

would have added something to the defense.  *Sheppard v. Warden, Lebanon Corr. Inst.,* 1:08cv298, 2009 WL 6315342, at *16 (S.D. Ohio Sept. 29, 2009) (Black, M.J.) (Report & Recommendation) (citing *United States v. Faulkner,* 538 F.2d 724, 729-30 (6th Cir. 1976)), *adopted,* 2010 WL 1213500 (S.D. Ohio Mar. 25, 2010) (Spiegel, J.); *see also Foley,* 488 F.3d at 389 (holding that the petitioner must demonstrate that the denial of a continuance actually prejudiced the defense); *United States v. Moreno,* 933 F.2d 362, 371 (6th Cir. 1991) (same).

In this case, the Ohio Court of Appeals considered the relevant factors in assessing the propriety of the trial court's decision to deny petitioner's request for a continuance, and reasonably determined that the trial court's ruling did not constitute reversible error and certainly was not so arbitrary as to amount to a violation of due process.

As the Ohio Court of Appeals pointed out, the case had been pending for many months, and the trial date had already been continued several times, at least twice as a result of petitioner's conduct.  Petitioner's request at the last hour for yet another continuance to review evidence made available to the defense over a year earlier demonstrates a lack of diligence on his part, particularly given that he refused to cooperate with his counsel, or more specifically, to listen to the summary of evidence provided by his counsel for the purpose of preparing a defense, in the many months preceding the trial.  Petitioner has not provided any explanation as to why he waited until trial to make his demands.  Nor has he shown that the denial of his request for a continuance prejudiced the defense.  Furthermore, given the evidence in the record suggesting that petitioner deliberately engaged in disruptive behavior during the trial to keep it from proceeding forward, the Ohio courts were well justified in finding that he had no legitimate reason for seeking a continuance at such a late juncture.  Upon review of the trial record, including the vague, unsubstantiated and non-

26

compelling reasons provided by petitioner to the trial court for granting yet another continuance in the case, *see Ungar*, 376 U.S. at 589, the undersigned concludes that the Ohio courts properly held that a continuance was not warranted under the circumstances of this case.

2.  Denial of Motion for New Counsel.

The Sixth Amendment "secures the right to the assistance of counsel, by appointment if necessary, in a trial for any serious crime."  *Wheat v. United States,* 486 U.S. 153, 158 (1988).  The Supreme Court has stated that the "purpose of providing assistance of counsel 'is simply to ensure that criminal defendants receive a fair trial,' . . . and that in evaluating Sixth Amendment claims, 'the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.'"  *Id.* at 159 (quoting *Strickland v. Washington,* 466 U.S. 668, 689 (1984), and *United States v. Cronic,* 466 U.S. 648, 657 n.21 (1984)).  "Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."  *Id.*

As the Ohio Court of Appeals recognized in the instant case, the Sixth Amendment right to counsel does not include the right to a "*meaningful attorney-client relationship.*"  *Morris v. Slappy,* 461 U.S. 1, 13-14 & n.6 (1983) (emphasis in original).[6]  In *Morris*, the petitioner unsuccessfully sought a continuance during his trial because he was dissatisfied with his trial attorney and wanted his original defense attorney, who had been hospitalized shortly before trial, to serve as trial counsel.  *Id.* at 6-8.  In that case, the Supreme Court held that the trial court was "abundantly

---

[6]*Cf. Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 624-25 (1989) (holding that the Sixth Amendment does not entitle indigent defendants to the appointment of counsel of their own choosing).

justified in denying [the petitioner's] midtrial motion for continuance so as to have [his original attorney] represent him," because "it could reasonably have concluded that [the petitioner's] belated requests to be represented by [the attorney] were not made in good faith but were a transparent ploy for delay." *Id.* at 13.

Although *Morris* involved the denial of a request for a continuance, the decision is pertinent to petitioner's claim challenging the denial of his request for new counsel asserted for the first time on the first day of trial. *Cf. Sheppard, supra,* 2009 WL 6315342, at *19-20 (S.D. Ohio Sept. 29, 2009), *adopted,* 2010 WL 1213500, at *5-6 (S.D. Ohio Mar. 25, 2010); *Henness v. Bagley,* No. 2:01cv43, 2007 WL 3284930, at *46 (S.D. Ohio Oct. 31, 2007) (Merz, M.J.); *see also Charley v. Bagley,* No. 1:03cv1607, 2006 WL 1624240, at *8 (N.D. Ohio June 2, 2006) (denying habeas relief because the Ohio appellate court's application of *Morris* in upholding the trial court's refusal to appoint substitute counsel was reasonable).

As the court stated in *Henness, supra,* 2007 WL 3284930, at *46:

> The timing of the request, any delay in the proceedings, and the inconvenience to the trial participants are all factors for a trial court to consider when deciding either a motion for a continuance or a request for new counsel.  Not to be ignored, however, is the reason for the request, as *Morris* demonstrates.  If the attorney-client relationship is such that the attorney is able to provide competent representation, then the client's dislike of or disagreement with his attorney generally cannot provide a basis for a continuance or appointment of new counsel.  Otherwise, a defendant could prolong his trial indefinitely, repeatedly claiming not to trust or be able to work with his attorney, regardless of the attorney's preparedness or willingness and ability to provide competent representation to the client.

Here, neither the trial court's denial of petitioner's request for new counsel nor the Ohio Court of Appeals' decision upholding that ruling are unreasonable under *Morris.*

First, given that the case had been pending for many months and the trial date had been

28

continued several times, petitioner's demand for a new attorney on the first day of trial was untimely. *See, e.g., Bailey v. Trombley,* No. 05-10190, 2008 WL 2937843, at *8 (E.D. Mich. July 24, 2008); *cf. United States v. White,* 451 F.2d 1225, 1226 (6th Cir. 1971) (per curiam) (holding that "the refusal of the [court] to appoint substitute counsel on the eve of the trial" is not improper).

Second, as discussed above in addressing the denial of petitioner's continuance motion, it was reasonable for the state courts to conclude that, like his last-minute request for a continuance to review the evidence, petitioner's belated request for new counsel was not made in good faith, but rather was "a transparent ploy for delay." *See Morris,* 461 U.S. at 13; *cf. Edsall v. Lazaroff,* No. 99-3128, 2000 WL 263273, at *2 (6th Cir. Mar. 10, 2000) (holding that the state appellate court did not unreasonably determine the facts in finding that the defendant, who waited until the scheduled trial date to make his request for new counsel, acted "with the purpose to hinder the orderly administration of justice"). Indeed, petitioner's repeated demand for a new lawyer was particularly suspect because, although he generally contended his current counsel was "incompetent" and had told him "nothing but lies," petitioner evaded answering any questions calling for specific instances of malfeasance by counsel to support those claims.

Finally, both the trial court and prosecutor vouched for counsel's competence and preparedness for trial. Indeed, upon review of the record, it appears that petitioner's counsel was prepared and willing to represent petitioner at trial even though petitioner refused to cooperate with him and engaged in such disruptive and disrespectful behavior during the trial that the trial court found it necessary to use restraints and order petitioner's removal from the courtroom for a period of time.

Accordingly, in sum, the undersigned concludes that the trial court's decision to deny

29

petitioner's requests during the trial for a continuance and new counsel was reasonable and does not trigger concerns that petitioner was deprived of his Sixth Amendment right to the effective assistance of counsel. Petitioner, therefore, is not entitled to relief based on the claim alleged in Ground Two of the petition.

### C.  Petitioner Is Not Entitled To Relief On His Claim In Ground Three Alleging A Denial Of His Right Of Self-Representation When He Was Removed From The Courtroom During Trial

In Ground Three of the petition, petitioner contends that he was deprived of his Sixth Amendment right of self-representation when, after the trial court granted him permission to represent himself at trial, it ordered his removal from the courtroom and allowed the case to proceed with counsel taking over his representation during his absence from the trial. (Doc. 3, p. 9).

The constitutional claim was raised on appeal to both the Ohio Court of Appeals and Ohio Supreme Court and is subject to review on the merits. As discussed earlier, *see supra* pp. 11-13, under the applicable standard of review set forth in 28 U.S.C. § 2254(d), petitioner is not entitled to relief on the claim, which was adjudicated by the state courts, unless the state courts' resolution of the federal issue is contrary to or involves an unreasonable application of clearly-established federal law as determined by the Supreme Court, or is based on an unreasonable determination of the facts. No such showing has been made in this case.

The Ohio Court of Appeals was the only state court to issue a reasoned decision addressing the constitutional issue presented on appeal. Citing federal case-law, including the Supreme Court's decisions in *Martinez v. Court of Appeal of California,* 528 U.S. 152 (2000), and *McKaskle v. Wiggins,* 465 U.S. 168 (1984), the state appellate court overruled the assignment of error. (Doc. 7, Ex. 14, pp. 8-10). In rejecting petitioner's claim, the court made findings of fact, which are

30

presumed correct, *see supra* p. 1 n.1, and reasoned in pertinent as follows:

> The right of self-representation is not absolute. At times, the government's interest in ensuring the integrity and efficacy of the trial will outweigh the defendant's interest in acting as his own lawyer. Further standby counsel may participate in the trial proceedings, even without the express consent of the defendant, as long as that participation does not "seriously undermine" the "appearance before the jury" that the defendant is representing himself.
>
> We hold that when a defendant elects to represent himself at trial in a criminal proceeding, and that defendant's conduct, following a warning to desist, is so disruptive that it threatens the integrity and efficacy of the trial, he has forfeited his right to self-representation. The trial court may remove the defendant from the proceedings and allow standby counsel to represent the defendant. In its discretion, the court may allow the defendant to return and resume self-representation when it is satisfied that the defendant no longer poses a risk of future disruption.
>
> In this case, Mizell's continued disruptive behavior threatened to undermine the integrity and efficacy of the trial. His outbursts during the state's direct examination of Martin were distracting to the jury and prevented the prosecutor from hearing her responses to his questions. Mizell was warned repeatedly that continuing on that course would result in his removal from the proceedings. His continued disruptive behavior resulted in the forfeiture of his right to self-representation. The trial court did not abuse its discretion when it ordered Mizell to be removed. Nor did it abuse its discretion when it ordered standby counsel to resume his role of representing Mizell until the court became satisfied that Mizell could return and resume self-representation.
>
> Within this assignment of error, Mizell claims that appointed counsel was ineffective during the time he stood in Mizell's place. He argues, without citation to the record, that "he allowed the prosecutor to completely lead all of the State's witnesses," that "[h]e allowed the State's witnesses to offer hearsay statements and offer opinions of third parties without objection," and that "[h]e allowed Ms. Martin to parade the child in front of the jury."
>
> The failure to object to leading questions does not constitute ineffective assistance. As for the complaints regarding hearsay and third-party opinions, Mizell has not cited the specific instances of allegedly ineffective assistance in the record, nor has he demonstrated how he was prejudiced by any such transgressions. Finally, Mizell fails to argue how allowing the jury to see the victim in this case was ineffective assistance.

(Doc. 7, Ex. 14, pp. 8-10) (footnote citations omitted).

31

*Faretta v. California*, 422 U.S. 806 (1975), is the seminal Supreme Court decision recognizing the Sixth Amendment right of self-representation, which spawned the later Supreme Court precedents cited by the state appellate court in rejecting petitioner's claim of constitutional error on direct appeal.  In *Faretta,* the Supreme Court held that the Sixth and Fourteenth Amendments of the Constitution guarantee that "a defendant in a state criminal trial has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so."  *Faretta,* 422 U.S. at 807.   In so ruling, the Court noted, however, that "[t]he right of self-representation is not a license to abuse the dignity of the courtroom" or to refuse "to comply with relevant rules of procedural and substantive law."  *Id.* at 834 n. 46.  Citing *Illinois v. Allen*, 397 U.S. 337 (1970), and *United States v. Dougherty*, 473 F.2d 1113, 1124-26 (D.C. Cir. 1972), the Court further noted in addressing the dissent's contention that "criminal defendants representing themselves may use the courtroom for deliberate disruption of their trials:"

> [T]he trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct. . . .  Of course, a State may–even over objection by the accused–appoint "standby counsel" to aid the accused if and when the accused requests help, *and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary.*

*Faretta,* 422 U.S. at 834 n. 46 (emphasis added).[7]

Since *Faretta*, the Supreme Court has reaffirmed in subsequent decisions that the "right to self-representation is not absolute" and may be terminated with the appointment of standby counsel, "even over the defendant's objection," in cases where "the government's interest in

---

[7]As discussed earlier in addressing the claim alleged in Ground One, the Supreme Court stated in *Allen* that a constitutionally permissible way to handle a "disruptive, contumacious, stubbornly defiant" defendant is to remove the defendant from the courtroom "until he promises to conduct himself properly."  *Allen,* 397 U.S. at 343-44.  In *Dougherty*, the D.C. circuit court held that the "right to self-representation . . . can be lost by disruptive behavior during trial, constituting constructive waiver" of the right.  *See Dougherty,* 473 F.2d at 1124-25.

ensuring the integrity and efficiency of the trial . . . outweighs the defendant's interest in acting as

his own lawyer." *Martinez,* 528 U.S. at 161-62; *see also McKaskle,* 465 U.S. at 173 (stating that

"an accused has a Sixth Amendment right to conduct his own defense, provided . . . that he is able

and willing to abide by rules of procedure and courtroom protocol").   Numerous lower courts have

applied these principles in upholding the termination of a defendant's right of self-representation

during trial when the defendant engages in obstructive, obstreperous behavior that serves to disrupt

the trial proceedings.  *See, e.g., United States v. Young,* 199 F. Supp.2d 697, 701-02 (S.D. Ohio

2001) (citing *United States v. West,* 877 F.2d 281, 287 (4th Cir. 1989); *United States v. Brock,* 159

F.3d 1077 (7th Cir. 1998));[8] *Blunt v. Berghuis,* No. 4:08cv14808, 2011 WL 1330754, at *5-6 (E.D.

Mich. Apr. 5, 2011) (and cases cited therein).

 Here, the Ohio Court of Appeals properly identified and reasonably applied the clearly-

established legal principles enunciated by the Supreme Court in *Faretta* and its progeny in finding

that the petitioner forfeited his right of self-representation when he engaged in such disruptive

behavior during the trial that the court was forced to order his removal from the courtroom for a

period of time.  Before the trial even began, petitioner demonstrated an inability or unwillingness

to comply with the rules of courtroom protocol, refusing to accept unfavorable rulings by the court

and engaging in such defiant and obstructive conduct that a deputy requested and was granted

permission to place petitioner in a restraint.  (*See* Doc. 7, Ex. 29, Tr. 45-59).  As the Ohio Court of

---

 [8]In *Young,* the district court revoked the defendant's right of self-representation and reappointed his attorney, who had been serving in an advisory role, as counsel of record because the defendant had "demonstrated that he is without the ability to control himself, when he does not get his way."  *Young,* 199 F. Supp.2d at 702.  In ordering the termination of the self-representation right due to the defendant's inability or unwillingness to abide by the rules of courtroom protocol, the court emphasized:  "*Faretta* does not require this Court to conduct a trial in which there is the distinct possibility, if not probability, that, whenever he disagrees with a ruling of the Court, the Defendant will become hysterical and disrupt proceedings."  *Id.*

Appeals found, petitioner's disruptive behavior continued into the trial itself and was so serious that the jury "couldn't hear the testimony," and the prosecutor could "hardly ask . . . questions," of the State's first witness. (Doc. 7, Ex. 30, Tr. 237-38). Indeed, evidence in the record suggests that petitioner deliberately engaged in the disruptive behavior that led to his removal from the courtroom in an attempt to delay the trial, if not to derail the entire trial proceedings. (Doc. 7, Ex. 30, Tr. 239-42). The court repeatedly warned petitioner, who "already ha[d] an electrical stun belt on him," that if he continued to be disruptive, he would be removed from the courtroom. (Doc. 7, Ex. 30, Tr. 236-37). Petitioner's removal was ordered only after he refused to comply with the court's warnings and admonitions, and continued to argue with the court and demand "all the evidence I want." (Doc. 7, Ex. 30, Tr. 236-37). At the side-bar conference held immediately after petitioner was taken out of the courtroom, the court stated for the record:

> It's his constitutional right to represent himself, however, we have a funny situation where he's acting up and using that as a device to act up because he knows he has the right to represent himself. He thinks I can't remove him, but at this point I had to remove him for the safety of the jurors, too, because . . . I was informed by the Sheriff's Department today he was going to create a scene and try to disrupt the entire proceedings, and actually he was pretty violent right before being brought to the courtroom.

> It's already three o'clock. He's been acting up all day. We finally got him calmed down, just started the trial. We were supposed to start at 10:30, but we couldn't because he was too disruptive. It got so out of hand I had to have him removed.

(Doc. 7, Ex. 30, Tr. 241-42).

Certainly, under the circumstances presented in this case, the Ohio courts reasonably determined petitioner's right of self-representation was outweighed by the State's interest in ensuring not only the integrity and efficiency of the trial, but also the safety of the jurors, and that the termination of the self-representation right, therefore, was constitutionally permissible under

34

*Faretta*, *Martinez* and *McKaskle*. (*See* Doc. 7, Ex. 30, Tr. 241). The reappointment of petitioner's counsel to serve as counsel of record during petitioner's absence from the courtroom also was constitutionally permissible under *Faretta* and its progeny. Upon review of the record, the undersigned further finds that petitioner's counsel was prepared to represent petitioner at the trial and provided competent assistance during the period of time petitioner was absent from the courtroom. (*See* Doc. 7, Ex. 30, Tr. 242-301). As the Ohio Court of Appeals reasonably determined, petitioner has not established that his counsel's representation during that time constituted ineffective assistance within the meaning of the Sixth Amendment. Petitioner has not shown, as required under *Strickland v. Washington,* 466 U.S. 668, 687-88, 695 (1984), that counsel's performance both (1) fell below an objective standard of reasonableness based on all the circumstances surrounding the case, and (2) prejudiced the defense by undermining the reliability of the trial result.

Accordingly, in sum, the Court concludes that petitioner is not entitled to relief based on the claim alleged in Ground Three of the petition challenging the termination of his Sixth Amendment right of self-representation upon his removal for a period of time from the courtroom for disruptive behavior.

### D. Petitioner Is Not Entitled To Relief On His Claim In Ground Four Challenging His Delayed Indictment For Felonious Assault On Speedy Trial Grounds

In Ground Four of the petition, petitioner alleges that his indictment in Case No. B-0704314 for felonious assault should have been dismissed "on the basis of pre-indictment delay" and as a violation of his right to a speedy trial. (Doc. 3, p. 11).

It appears from the record that petitioner never asserted at trial that his indictment,

35

prosecution or conviction on the felonious assault charge was subject to challenge on speedy trial grounds.  He raised the issue for the first time on direct appeal, arguing that his belated indictment for felonious assault, months after his indictment for child endangerment and nearly a year after the incident giving rise to the charges had occurred, was improper.  (*See* Doc. 7, Ex. 12, pp. 10-11).

The Ohio Court of Appeals, which was the only state court to issue a reasoned decision addressing petitioner's claim, relied solely on state case-law in overruling the assignment of error. (Doc. 7, Ex. 14, pp. 10-12).  The court found that the indictment for felonious assault "was brought to trial within the deadline imposed by [Ohio's] speedy-trial statute," because "there was no claim that the speedy-trial time had expired with respect to the child-endangerment charge" and, therefore, "any delays in that case did not work in [petitioner's] favor in the prosecution of the separately numbered felonious-assault charge."  (Doc. 7, Ex. 14, p. 11).  The state appellate court also rejected any claim of error stemming from "pre-indictment delay" because petitioner "had failed to show prejudice" resulting from the delay.  (Doc. 7, Ex. 14, p. 11).  The court was not persuaded by petitioner's argument that he was prejudiced because the felonious assault charge was more serious than child endangerment and his potential prison sentence was "significantly increased" by the additional charge.  (Doc. 7, Ex. 14, pp. 11-12).  Reasoning that such an argument "only relates to how Mizell may have been prejudiced in a general sense . . . and . . . has no bearing on any prejudice he may have suffered as a result of pre-indictment delay," the Ohio Court of Appeals concluded: "When a defendant points to no particularized loss of evidence or witnesses as a result of pre-indictment delay, and when nothing in the record demonstrates such a loss, no actual prejudice is shown."  (Doc. 7, Ex. 14, p. 12).

As an initial matter, because the federal habeas court only has jurisdiction to consider

whether petitioner's confinement violates the Constitution, laws or treaties of the United States, petitioner is unable to prevail on any claim of error under Ohio's speedy trial statute or state case-law interpreting the Ohio statute. *See* 28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions"). The Court only has jurisdiction to consider whether the delay in seeking and obtaining a second indictment on the additional count of felonious assault amounted to a violation of petitioner's federal constitutional speedy trial right.

"[I]t has been generally held that the [Sixth Amendment] Speedy Trial Clause applies to intervals between separate indictments or between separate trials on the same charge." *Dickey v. Florida,* 398 U.S. 30, 43-44 (1970). The Sixth Amendment guarantees a defendant the right to a speedy trial, which involves a fact-intensive inquiry requiring the balancing of (1) "whether [the] delay before trial was uncommonly long;" (2) "whether the government or the criminal defendant is more to blame for the delay;" (3) "whether, in due course, the defendant asserted his right to a speedy trial;" and (4) "whether he suffered prejudice as the delay's result." *Doggett v. United States,* 505 U.S. 647, 651, 655 (1992); *Barker v. Wingo,* 407 U.S. 514, 530 (1972); *see also Wilson v. Mitchell,* 250 F.3d 388, 394 (6th Cir. 2001).

The "first step of the balancing test, the length of the delay, is the triggering factor because 'until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.'" *Wilson,* 250 F.3d at 394 (quoting *Barker,* 407 U.S. at 530); *see also Doggett,* 505 U.S. at 651-52. Moreover, if the length of the delay is found to be "presumptively prejudicial," it must be considered "as one factor among several" in determining

whether the accused was deprived of his Sixth Amendment speedy trial right.  *See Doggett,* 505 U.S. at 652 (citing *Barker,* 407 U.S. at 533-34).  The Supreme Court noted in *Doggett* that "the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year."  *Doggett*, 505 U.S. at 652 n.1.

Because the Ohio Court of Appeals did not address the Sixth Amendment issue, the undersigned will assume, without deciding, that the delay of nearly ten months in charging petitioner with felonious assault was presumptively prejudicial.  However, the inquiry does not end here, as the length of the delay is only one factor to consider in determining whether a speedy trial violation occurred.

In examining the reasons for the delay, the Supreme Court has "made it clear that 'different weights [are to be] assigned to different reasons' for delay."  *Doggett,* 505 U.S. at 657 (quoting *Barker,* 407 U.S. at 531).  On the one hand, "speedy trial standards recognize that pretrial delay is often both inevitable and wholly justifiable," such as when the government "may need time to collect witnesses against the accused," which is given "great weight" in the State's favor and requires a showing of "specific prejudice to the defense."  *Id.* at 656.  On the other hand, "official bad faith in causing delay will be weighed heavily against the government," even in cases involving a relatively short delay.  *Id.*

The Court continued:

Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground.  While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him. . . .

Although negligence is obviously to be weighed more lightly than a deliberate intent

to harm the accused's defense, it still falls on the wrong side of the divide between
acceptable and unacceptable reasons for delaying a criminal prosecution once it has
begun.  And such is the nature of the prejudice presumed that the weight we assign
to official negligence compounds over time as the presumption of evidentiary
prejudice grows.  *Thus, our toleration of such negligence varies inversely with its
protractedness*. . . .

*Id.* at 656-57 (emphasis added).

In this case, upon consideration of the *Barker* factors, the undersigned is convinced that the

delay in obtaining the indictment filed on May 31, 2007, approximately ten months after the July

20, 2006 incident, on the felonious assault count did not deprive petitioner of his constitutional

right to a speedy trial.  (*See* Doc. 7, Ex. 5).  The record supports a finding that at least part of the

State's delay in pursuing the additional charge after the initial child-endangerment indictment was

returned in August 2006, stemmed from legitimate investigational concerns about the cause, extent

and permanency of the victim's injuries, as later revealed in the pre-sentence investigation report

reviewed by the trial court in rejecting the plea bargain recommendation on the child endangerment

charge in April 2007.  In any event, no showing has been made that the State acted in bad faith, and

any lack of diligence on the State's part in pursuing an indictment on the additional charge does not

weigh heavily against the State when balanced against the length of delay, which was not so

protracted as to warrant relief absent evidence of specific prejudice to the defense.

The remaining *Barker* factors also weigh heavily against petitioner because (1) petitioner

did not object to his indictment for felonious assault or assert his right to a speedy trial at any point

either before or during his trial in the joined criminal cases, and (2) as the Ohio Court of Appeals

reasonably found, petitioner failed to demonstrate any prejudice resulting from the delay.  The

speedy trial right is designed to protect against "oppressive pretrial incarceration," to reduce the

"anxiety and concern of the accused," and to "limit the possibility that the defense will be impaired" by dimming memories and loss of exculpatory evidence. *Barker,* 407 U.S. at 532; *see also Doggett,* 505 U.S. at 654.  Petitioner has not shown that any of those interests were harmed by the delay in this case.  The Ohio appellate court reasonably determined that petitioner's general argument of prejudice resulting solely from the filing of an additional criminal charge was insufficient to establish prejudice stemming from a delay in bringing the charge.

Accordingly, upon balancing the four *Barker* factors, the undersigned concludes that petitioner is not entitled to habeas corpus relief on his claim that the ten-month delay in the filing of the additional felonious assault charge deprived him of his constitutional right to a speedy trial. The state courts' adjudication of the claim is entitled to deference under the applicable standard of review set forth in 28 U.S.C. § 2254(d), *see supra* pp. 11-13, because it is not "so lacking in justification that there was an error well understood and comprehended in existing law [as determined by the Supreme Court] beyond any possibility of fairminded disagreement."  *See Harrington,* 131 S.Ct. at 786-87.

## IT IS THEREFORE RECOMMENDED THAT:

1.  Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 3) be **DENIED** with prejudice.

2.  A certificate of appealability should not issue with respect to petitioner's claims for relief, which have been addressed on the merits herein, because petitioner has not stated a "viable claim of the denial of a constitutional right" in any of his grounds for relief, nor are the issues presented in each ground "adequate to deserve encouragement to proceed further."  *See Slack v. McDaniel,* 529 U.S. 473, 475 (2000) (citing *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983));

*see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

    3.  With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and, therefore, should **DENY** petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

Date:  4/27/2011                 s/Karen L. Litkovitz
            cbc                        Karen L. Litkovitz
                                 United States Magistrate Judge

41

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

TERRY MIZELL,                                    Case No. 1:10-cv-53
      Petitioner,

                                         Beckwith, J.
      vs                                 Litkovitz, M.J.

WARDEN, MADISON CORRECTIONAL
INSTITUTION,
      Respondent.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).